In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 12-3367, 12-3368, 12-3369, 12-3370 and 12-3371

SUPERIOR TRADING, LLC, *et al.*,

*Petitioners-Appellants*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee*.

Appeals from the United States Tax Court.
Nos. 20171-07, 20230-07, 20243-07, 20655-07, 19543-08 —
**Robert A. Wherry, Jr.**, *Judge*.

ARGUED APRIL 19, 2013 — DECIDED AUGUST 26, 2013

Before EASTERBROOK, *Chief Judge*, and POSNER and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. These appeals are by multiple LLCs (limited-liability companies) involved in the creation and administration of a tax shelter. For the sake of simplicity we'll treat the appeals as one appeal, by Warwick Trading, LLC. The other appellants are subsidiaries of Warwick used to attract investors in it and needn't be discussed separately. The appeal challenges a decision by the Tax Court uphold-

ing the disallowance by the Internal Revenue Service of losses claimed by Warwick (ultimately for the benefit of the investors in the tax shelter) and also upholding a 40 percent penalty for a "gross valuation misstatement." 26 U.S.C. §§ 6662(a), (h); 137 T.C. 70, 87, 91–92 (2011); see also T.C. Memo 2012-110, 103 T.C.M. (CCH) 1604 (opinion denying reconsideration). The dollar amount of the penalty, which depends on the tax losses improperly taken by the investors in the shelter, has not yet been determined.

An LLC, such as Warwick, is generally treated as a partnership for tax purposes, Treas. Reg. § 301.7701–3(a), and like other partnerships its income and losses are deemed to flow through to the partners and are taxed to them rather than to the partnership. 26 U.S.C. §§ 701–04, 6031. Until 1982 "all partnership items were determined at the individual taxpayer level." But this "often required duplicative proceedings for different partners and sometimes resulted in inconsistent treatment of partnership items from partner to partner." *Petaluma FX Partners, LLC v. Commissioner*, 591 F.3d 649, 651 (D.C. Cir. 2010); see also *Southgate Master Fund, L.L.C. v. United States*, 659 F.3d 466, 469 n. 4 (5th Cir. 2011). So the law was changed, and now how much partnership income or loss should be given recognition for tax purposes when the partners file their tax returns is determined by an audit of the partnership. 26 U.S.C. §§ 6221–6232.

Warwick had been created by a lawyer named John Rogers, the petitioner in the companion case of *Rogers v. Commissioner*, No. 12-2652, also decided today. (We note with disapproval the loquacity of, and lame attempts at humor in, the Tax Court's opinion, which include making fun of Rogers' name, as in the section title "Mr. Rogers' Neighbor-

hood.") The purpose of creating Warwick was to beat taxes by transferring the losses of a bankrupt Brazilian retailer of consumer electronics named Lojas Arapuã S.A. to U.S. tax-payers who would deduct the losses from their taxable income. Arapuã had receivables with a face value of U.S. $30 million. Because they were to a great extent uncollectible (they were owed by consumers, had very small balances, and were very old), they had a negligible market value. Rogers used a company that he owned, Jetstream Business Limited, to join with Arapuã in forming Warwick. Jetstream was designated the managing (that is, the active) partner, charged with trying to collect the receivables. The net receipts from Jetstream's activity would be Warwick's partnership income and would eventually be divided between Jetstream (meaning Rogers) and Arapuã.

Rogers' aim was to create what is called a distressed asset/debt ("DAD") tax shelter. See IRS, "Coordinated Issue Paper—Distressed Asset/Debt Tax Shelters," LMSB-04-0407-031, Apr. 18, 2007, www.irs.gov/Businesses/Partnerships/Coordinated-Issue-Paper—Distressed-Asset-Debt-Tax-Shelters (visited Aug. 26, 2013). A DAD shelter is based on a tax loophole closed by the American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 833, 118 Stat. 1589, amending 26 U.S.C. §§ 704(c), 743, the year after Rogers created Warwick. To spare the reader a headache, we'll provide a simplified explanation of Rogers' DAD.

When an asset is contributed to a partnership, the contributor receives in exchange a partnership interest. The partnership formally owns the contributed asset, but the contributor owns a slice of the partnership in recognition of his contribution, and so hasn't really parted with the asset.

In the hands of the partnership the asset's basis is the contributor's original basis, which (with adjustments that we can ignore) is the asset's original cost. 26 U.S.C. §§ 723, 1012. Recognition for tax purposes of gain or loss attributable to any change in the asset's value *before* the asset was contributed to the partnership is deferred until the partnership sells the asset. See 26 U.S.C. § 721(a). So if the asset is worth less than the contributor paid for it, that loss in value (what is termed "built-in loss") will be recognized, and thus usable to reduce taxable income, only when the partnership sells the asset. See 26 U.S.C. § 704(c)(1)(A); Laura E. Cunningham & Noël B. Cunningham, *The Logic of Subchapter K* 10 (4th ed. 2011). If the contributing partner sells his partnership interest before the partnership sells the contributed asset, the buyer of the partnership interest steps into his shoes and so recognizes built-in loss or gain if and when the partnership sells the asset. Treas. Reg. § 1.704-3(a)(7).

Rogers' DAD involved Arapuã's contributing its receivables with built-in losses to Warwick, followed by the sale of Arapuã's partnership interest (acquired by contributing those receivables to the partnership) to investors—the tax-shelter seekers. Because the tax shelterers bought Arapuã's interest in the partnership, the partnership's losses when it sold the receivables flowed through to the investors as Arapuã's successors in the partnership.

The investor-partners' purpose in buying Arapuã's interest in the partnership (and thus becoming Jetstream's partners—for remember that Arapuã and Jetstream were the original partners in Warwick) was to deduct the built-in loss. But a partner can claim a loss only up to the amount of his basis in the partnership, 26 U.S.C. §§ 704(d); 705(a)(2)(A); 9

*Mertens Law of Federal Income Taxation* § 35C:1 (2013), and the basis of the partnership interest that an investor acquired (thereby becoming a partner) was the price at which Arapuã had sold the interest to him. Treas. Reg. § 1.742-1. That price would have been very low, since the buyers—the shelter investors—were just buying tax savings based on built-in loss. In fact each dollar of that loss could be worth no more than 35 cents in tax savings, because the top income tax bracket in 2004 was 35 percent. So the most a top-bracket shelter investor would pay Arapuã for a partnership interest that would give the investor the right to its built-in loss would be a sliver less than 35 percent of the loss, for otherwise he'd obtain no tax savings. In fact the shelter investors paid only 3 to 6 percent of the value of the losses they obtained by buying into the shelter.

But the investor had to contribute additional property to the partnership in order to inflate his basis in his partnership interest to a level at which he could deduct the entire built-in loss. 26 U.S.C. § 722. If he paid $100 for an asset once worth $1000, he could not claim a loss of $900—the full built-in loss—but only of $100; the other $800 of losses would be wasted from a tax-avoidance standpoint. The assets that the shelter investors contributed in order to raise their basis to the built-in loss were promissory notes made out to the partnership. The notes had no value because Rogers had no intention of causing Warwick to collect on them. The intention was simply to create the appearance that the investors' interest in the partnership had a high enough basis to enable the entire built-in loss that the shelter investors had acquired to be offset against their taxable income. But all this means is that the investors should not have been permitted to deduct their entire built-in loss—yet in fact they shouldn't have

been permitted to deduct any part of it, because the partnership was a sham. It was really just a conduit from the original owner of the receivables (Arapuã) to the U.S. taxpayers who wanted a deduction equal to the difference between the face amount of the receivables (the promissors' debt) and the receivables' current, greatly depressed market value.

A genuine partnership is a business jointly owned by two or more persons (or firms) and created for the purpose of earning money through business activities. If the only aim and effect are to beat taxes, the partnership is disregarded for tax purposes. "[T]ax considerations cannot be the *only* reason for a partnership's formation." *Southgate Master Fund, L.L.C. v. United States*, *supra*, 659 F.3d at 484 (emphasis in original). There must be a "profit-motivated reason to operate as a partnership." *Id*. "[T]he absence of a nontax business purpose is fatal." *ASA Investerings Partnership v. Commissioner*, 201 F.3d 505, 512 (D.C. Cir. 2000).

Jetstream, supposedly the active partner in Warwick, made a few, feeble attempts at collecting the receivables that Arapuã had contributed to the partnership. The attempts were window dressing. Collection would have been governed by Brazilian law, which required that the contract for the transfer of Arapuã's receivables to Warwick be translated into Portuguese and filed with the Brazilian government. Neither of these things was done. Indeed there is considerable doubt whether the receivables, which could be transferred only pursuant to Brazilian law, were ever actually transferred to Warwick.

The reason for Rogers' insouciance regarding formalities was that the aim of the partnership was not to make money by collecting on Arapuã's receivables—which apparently

would have been a Quixotic undertaking, for collection efforts were perfunctory and yielded little revenue—but to sell interests in the partnership to U.S. taxpayers seeking tax savings. The revenue from the sale of these interests was the partnership's only revenue.

A transaction that would make no commercial sense were it not for the opportunity it created to beat taxes doesn't beat them. Substance prevails over form. See *Gregory v. Helvering*, 293 U.S. 465, 470 (1935), and *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 439 (1943), and for application to a sham partnership *Southgate Master Fund, L.L.C. v. United States*, *supra*. The question is "whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both." *Commissioner v. Tower*, 327 U.S. 280, 287 (1946); see also *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949); *Southgate Master Fund, L.L.C. v. United States*, *supra*, 659 F.3d at 483–91; *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 231–32 (2d Cir. 2006); *ASA Investerings Partnership v. Commissioner*, *supra*, 201 F.3d at 511–13; Cunningham & Cunningham, *supra*, at 3. No joint business goal motivated the creation of Warwick. Arapuã's aim was to extract some value from its otherwise worthless receivables, Jetstream's aim to make the losses in those receivables a tax bonanza.

The appellants argue that these cases have been superseded. They point out that Warwick was created under Illinois law, that it was a valid LLC under that law, and that Treas. Reg. § 301.7701-3(b)(1) defines an LLC that has more than one member (as did Warwick) as a partnership unless the organizers choose to designate it for tax purposes as a corporation. But the purpose of the regulation is merely to

determine whether the default tax treatment of the entity shall be under the corporate or the partnership provisions of federal tax law, not whether it shall be entitled to the benefits (such as deferral of losses in contributed property) created by those provisions should they be found inapplicable for other reasons. As a sham partnership Warwick was entitled to none of the benefits that the Internal Revenue Code bestows on partnerships. See Treas. Reg. § 301.7701-1(a)(1); *Southgate Master Fund, L.L.C. v. United States*, *supra*, 659 F.3d at 483 n. 53. "An entity without economic substance, whether a sham partnership or a sham trust, is a sham either way and hence is not recognized for federal tax law purposes." *Sparkman v. Commissioner*, 509 F.3d 1149, 1156 n. 6 (9th Cir. 2007).

With Warwick out of the picture, the tax shelter collapses, because all that is left is a sale by Arapuã of its receivables to the shelter investors. A built-in loss is recognized for tax purposes when the property with the loss is sold. 26 U.S.C. §§ 1001(a)-(c). The buyer's basis is what he pays, equal in this case to the very low market value of Arapuã's receivables. 26 U.S.C. § 1012. The buyer therefore has no built-in loss; that loss was recognized by Arapuã, once Arapuã's "contribution" to Warwick is recharacterized as a sale to the shelter investors.

Even if Warwick had been an actual rather than fake partnership between Arapuã and Jetstream, the cash transfer from the partnership to Arapuã within two years of that company's contribution of assets to Warwick would have created a presumption that the company had sold the assets (Arapuã's receivables) to the partnership and received the cash distribution as delayed payment for them, rather than

having contributed them to the partnership. Treas. Reg. § 1.707-3(c); see also 26 U.S.C. § 707(a)(2)(B). Arapuã received a substantial distribution from Warwick 10 months after contributing the receivables, thus triggering the presumption. The presumption has not been rebutted. Since Arapuã sold the receivables to Warwick rather than contributing them, it had to recognize any losses at the time of that sale, leaving no losses for the shelter investors to claim when they entered the partnership.

The judge decided to impose a penalty for the sham. Should he have? Section 6662(h)(1) of the Internal Revenue Code, read in conjunction with subsections (a) and (b)(3), imposes a 40 percent penalty on so much of an underpayment of tax as is attributable to any "gross valuation misstatement." Under subsection (h)(2)(A)(i) (2000 & Supp. IV 2004) which at the time defined "gross valuation misstatement" to cover any tax deduction involving property whose claimed price (basis) was more than four times its correct value, the valuation misstatement in this case had been "gross." The aggregate basis of the receivables transferred to Warwick had been close to zero, but Warwick, which is to say Rogers, had valued them at roughly $30 million.

There is a disagreement among courts of appeals concerning the applicability of the penalties for misstating valuation when the transaction involving the overvalued asset is itself disregarded because it lacks economic substance. Compare, e.g., *Crispin v. Commissioner*, 708 F.3d 507, 516 n. 18 (3d Cir. 2013); *Gustashaw v. Commissioner*, 696 F.3d 1124, 1136–37 (11th Cir. 2012), and *Fidelity Int'l Currency Advisor A Fund, LLC v. United States*, 661 F.3d 667, 672 (1st Cir. 2011), with *Keller v. Commissioner*, 556 F.3d 1056, 1059–61 (9th Cir.

2009), and *Heasley v. Commissioner*, 902 F.2d 380, 383 (5th Cir. 1990). The majority view, which we now join, is that a taxpayer who overstates basis *and* participates in sham transactions, as in this case, should be punished at least as severely as one who does only the former. The Supreme Court has granted certiorari to resolve the circuit conflict. *United States v. Woods*, 133 S. Ct. 1632 (2013).

The appellants would have avoided the penalty had they proved they had "reasonable cause" to deduct the built-in losses. 26 U.S.C. § 6664(c)(1); see *United States v. Boyle*, 469 U.S. 241, 250–51 (1985); *University of Chicago v. United States*, 547 F.3d 773, 785 (7th Cir. 2008); *Richardson v. Commissioner*, 125 F.3d 551, 558 (7th Cir. 1997). They didn't prove that. They were all just tools—extensions, really—of Rogers, an experienced tax lawyer who had more than 30 years of experience in the taxation of international business transactions. The tools had no more autonomy than his fingers. There is not even a colorable basis for the tax shelter that he created and the appellants implemented. There are as we've seen multiple grounds for disallowing the partnership losses that Rogers engineered (in fact more grounds than we've bothered to discuss), and all are grounds that he either knew about or should, given that he is no tax neophyte, have known about.

AFFIRMED.