In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1046

SUGARLOAF FUND, LLC,

*Petitioner-Appellant,*

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

Appeal from the United States Tax Court.
No. 671-10 — **Robert A. Wherry**, *Judge.*

ARGUED SEPTEMBER 28, 2018 — DECIDED DECEMBER 21, 2018

Before RIPPLE, SYKES, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Before us in this appeal is a tax shelter almost identical to the one we agreed reflected an abusive sham in *Superior Trading, LLC v. Commissioner*, 728 F.3d 676 (7th Cir. 2013). We reach the same conclusion here and affirm the Tax Court's judgment and imposition of penalties.

**I**

A

John Rogers is an experienced tax lawyer and the architect of a tax structure that the Commissioner of Internal Revenue has found to be an abusive tax-avoidance scheme. In *Superior Trading*, we considered the legitimacy of the scheme Rogers designed and implemented for the 2003 tax year. Here we consider a similar scheme he implemented for tax years 2004 and 2005.

Despite some minor changes that Rogers made over time, the gist of the scheme has remained the same: Rogers forms a partnership that he uses to acquire severely-distressed or uncollectible accounts receivables from retailers located in Brazil. A distressed or uncollectible receivable is exactly what it sounds like—an amount owed to a retailer for which there is no prospect of meaningful collection. For tax purposes the partnership carries the receivables at their face amount, not at the amount (often zero or something close to zero) any retailer or debt collector would estimate collecting. The partnership then conveys the receivables to U.S. taxpayers, who deem them uncollectible and deduct from their income the associated "loss." The upshot is reduced U.S. tax liability.

Against this general overview, we turn in more detail to the scheme at issue here. In April 2003 Rogers formed Sugarloaf Fund, LLC, effectively a partnership. Several Brazilian retailers then contributed accounts receivables to Sugarloaf in exchange for interests in the partnership. Sugarloaf structured the retailers' contributions in such a way to purportedly allow the partnership to assume the retailers' original basis in the receivables. Think of this as the

partnership acquiring a $100 receivable that nobody in good faith believed was worth more than $1 with the partnership nonetheless recording the receivable as a $100 asset. In this way, Sugarloaf assumed ownership of the receivables with a built-in loss ($99 in our example) that, through the scheme, would then be passed to U.S. taxpayers to reduce their income tax liability.

All of that happened this way: not long after making contributions to the Sugarloaf partnership, each of the Brazilian retailers redeemed their interests in the partnership, effectively cashing out the partnership interest they had received in exchange for their contribution of receivables.

Once Sugarloaf owned the uncollectible accounts receivables, the next part of the scheme required transferring them to U.S. taxpayers. Rogers did so by forming several limited liability companies in which Sugarloaf became a member and contributed the distressed or uncollectible receivables. In a complex series of transactions, the LLCs were, for all intents and purposes, then sold to various U.S. taxpayers. For tax purposes, whenever Sugarloaf sold an entity (and with it, the associated uncollectible receivables), it recognized an expense in an amount roughly equivalent to the face value of the receivables ($100 in our prior example). Sugarloaf characterized this expense as a cost-of-goods-sold expense. The U.S. taxpayer who acquired ownership of the uncollectible receivables also wrote them off and likewise claimed a bad-debt expense, typically for the same amount as the expense claimed by Sugarloaf. In this way, and consistent with the principles of partnership taxation, the "losses" on the receivables flowed through to the U.S. taxpayer who had invested in the LLC.

The IRS caught on to structures like this and encouraged legislation to prevent them. In October 2004, Congress accepted the invitation and amended the Tax Code to prohibit partnerships like Sugarloaf from transferring built-in-losses on uncollectible receivables to U.S. taxpayers in this manner. See American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 833, 118 Stat. 1589.

Undeterred, Rogers modified the scheme. In the new structure, the Sugarloaf partnership contributed the uncollectible receivables not in the first instance to an LLC, but instead to a trust in which Sugarloaf was both the grantor and beneficiary. Some additional maneuvering then ensued: a U.S. taxpayer would contribute cash in exchange for a beneficial interest in the trust; the trust would assign the receivables to a sub-trust; and the U.S. taxpayer would be designated as the beneficiary of the sub-trust. The U.S. taxpayer then claimed ownership of the accounts receivables, wrote them off, and deducted the associated bad-debt expense from their net income. The end result was the same under this modified structure—a reduced tax liability for the U.S. taxpayer.

B

The Commissioner determined that the Sugarloaf partnership was a sham formed solely to evade taxes. This determination had a consequence: the Brazilian retailers' purported contribution of receivables to Sugarloaf was recharacterized as a sale of assets from the Brazilian retailers to Sugarloaf. Treating the contribution as a sale had the effect of depriving Sugarloaf of the built-in-loss on the uncollectible receivables that it tried to pass along to U.S. taxpayers. Or, to put the point more technically, with the Brazilian retailers' contributions recharacterized as a sale, Sugarloaf's original basis in the

receivables was reduced to the fair value of the receivables—nearly nothing.

Upon receiving notice of the Commissioner's determination, Sugarloaf appealed in Tax Court. The parties went to trial to resolve the dispute, and the Tax Court issued an opinion in October 2014 affirming the Commissioner's determination that Sugarloaf was a sham partnership. In the alternative, the Tax Court determined that, even if Sugarloaf had been a legitimate or *bona fide* partnership, the Brazilian retailers' redemptions of their interest in the Sugarloaf partnership was, in substance, a sale of receivables from the retailers to Sugarloaf. This, too, had a consequence: pursuant to the step-transaction doctrine, the Commissioner was permitted to collapse the different steps of the scheme into one and thereby recharacterize the transaction as a sale of the Brazilian retailers' accounts receivables to Sugarloaf. See *Atchison, Topeka and Santa Fe R.R. Co. v. United States*, 443 F.2d 147, 151 (10th Cir. 1971) (explaining that under the step-transaction doctrine, a series of formally separate steps that are in substance "integrated, interdependent, and focused toward a particular end result" may be combined and treated as a single transaction"); *McDonald's Restaurants of Ill., Inc. v. Commissioner*, 688 F.2d 520, 524 (7th Cir. 1982) (describing different approaches to analysis under the step-transaction doctrine).

Based on these determinations, the Tax Court affirmed the Commissioner's adjustments to Sugarloaf's income. Those adjustments disallowed the cost-of-goods-sold expense the partnership reported for 2004 when it sold its interest in the LLCs and associated uncollectible receivables to various U.S. taxpayers. Additional adjustments reflected Sugarloaf's

failure to include certain income when reporting its 2004 and 2005 tax liabilities, and certain business expense deductions it reported but were not permitted.

The Tax Court also upheld penalties the Commissioner imposed on Sugarloaf, finding that a 40% penalty applied (pursuant to 26 U.S.C. § 6662(h)(1) & (2)(A)(1) (2000 & Supp. IV 2004)) to Sugarloaf's tax underpayment resulting from its gross misstatement of the 2004 cost-of-goods-sold expense, and a 20% penalty applied (pursuant to 26 U.S.C. § 6662(a), (b)(1) & (2)) to Sugarloaf's underpayments attributable to its negligence when failing to include certain income and taking disallowed business expense deductions on its 2004 and 2005 tax returns.

Sugarloaf now seeks relief in our court.

## II

### A

A preliminary matter warrants our consideration before turning to the merits. At oral argument, we raised a question of professional responsibility, asking whether John Rogers had a conflict of interest that prevented him from representing Sugarloaf in this appeal. We raised this concern because Rogers, in addition to serving as Sugarloaf's counsel, is the beneficial owner of Jetstream Business Limited, an entity that in turn owns an interest in Sugarloaf, and, as a result, has a personal financial interest in the outcome of the appeal. At oral argument Rogers responded by positing that there was no conflict of interest in part because he had obtained conflict-of-interest waivers from the U.S. taxpayers affected by the Commissioner's determinations at issue in this appeal.

We requested supplemental briefing on the conflict issue, and Rogers responded by maintaining that no conflict existed. He also submitted 35 conflict-of-interest waivers, only 12 of which were signed by the associated U.S. taxpayer. Rogers's supplemental brief provided little comfort that he was not laboring under an impermissible conflict.

At our request the Commissioner also submitted a brief on the conflict question. The Commissioner informed us that "all of the U.S. taxpayers whose tax liabilities were ultimately at issue in [the proceedings below] have entered into settlement agreements with the Commissioner or otherwise resolved their liabilities." The Commissioner added that a decision by our court affirming the Tax Court's judgment will result in no person other than Rogers being affected because the consequences of the Commissioner's adjustments to Sugarloaf's 2004 and 2005 partnership tax returns will all flow to Rogers.

We have no reason not to credit the Commissioner's representations. That the other U.S. taxpayers who invested in Rogers's scheme will not be affected by our decision is fundamental to our analysis. See Illinois Rules of Professional Conduct, Rule 1.7 (2010). Based on this representation, we conclude that any conflict of interest that otherwise may have existed does not prevent us from allowing Rogers to continue to represent Sugarloaf in this appeal.

All of this takes us to the merits.

B

Our review of the record before us leads us to renew what we underscored in *Superior Trading*: "the absence of a nontax business purpose is fatal," and "[i]f the only aim and effect are to beat taxes, the partnership is disregarded for tax purposes."

728 F.3d at 680 (citing *ASA Investerings Partnership v. Commissioner*, 201 F.3d 505, 512 (D.C. Cir. 2000)). "A transaction that would make no commercial sense were it not for the opportunity it created to beat taxes doesn't beat them." *Id*.

Despite Rogers's contention at oral argument that *Superior Trading* was "almost irrelevant" to the outcome in this appeal, the scheme at issue here is identical in all material respects to the one we considered in *Superior Trading*. Indeed, our observation in *Superior Trading* that the partnership at issue there was a sham applies with full force here. *Id.* (explaining that the partnership "was really just a conduit from the original owner of the receivables [the Brazilian retailers] to the U.S. taxpayers who wanted a deduction equal to the difference between the face amount of the receivables (the promissors' debt) and the receivables' current, greatly depressed market value").

The only difference here is that, for parts of 2004 and all of 2005, Rogers used trusts to transfer the tax losses to U.S. taxpayers. (He had not yet implemented this aspect of the scheme in *Superior Trading*.) But this difference has no effect on our analysis because it has no effect on the purpose of Sugarloaf's partnership—the modified scheme's use of trusts was nothing more than window dressing for Sugarloaf's method of transferring the uncollectible receivables and related "losses" to U.S. taxpayers.

The Sugarloaf partnership was a sham, and this conclusion is underscored by the record here in much the say way it was in *Superior Trading*. For example, in exchange for their contributions, two different Brazilian retailers were each granted separate 99% interests in Sugarloaf, a mathematical

impossibility that suggests the same blatant disregard for partnership formalities we observed in *Superior Trading*. See *id*. (explaining that the "reason for Rogers' insouciance regarding formalities was that the aim of the partnership was not to make money" but instead "to sell interests in the partnership to U.S. taxpayers seeking tax savings").

Take another example. The record indicates that the Brazilian retailers' contribution agreements did not identify the specific accounts receivables being transferred to Sugarloaf, nor were the agreements ever registered in Brazil, making their assignment to Sugarloaf invalid under Brazilian law. This fact alone, we observed in *Superior Trading*, undercuts any argument that Sugarloaf intended to engage in any good-faith effort to attempt to collect on the receivables. See *id*. (emphasizing that "there is considerable doubt whether the receivables, which could be transferred only pursuant to Brazilian law, were ever actually transferred to [the partnership]").

Even if we assumed that Sugarloaf was a *bona fide* partnership, the Tax Court properly determined that the step-transaction doctrine permitted the Commissioner to treat the Brazilian retailers' contributions and subsequent redemptions as a sale of assets. And with the transaction properly recharacterized as a sale, Sugarloaf's basis in the uncollectible receivables is reduced from their face value to what it paid for them, thereby voiding the bad-debt expenses Sugarloaf tried to pass along to U.S. taxpayers. The scheme collapses and is revealed for what it truly is—an abusive sham.

C

Finally, we review the penalties imposed by the Commissioner. As a threshold matter, Sugarloaf argues that the imposition of penalties was procedurally improper because the Commissioner has not shown that the approval requirements under 26 U.S.C. §§ 6751 and 7491 were obtained, and further, that these requirements are jurisdictional in nature and cannot be waived. This contention ignores what happened in the Tax Court.

Sugarloaf stipulated in the Tax Court that the Commissioner had properly obtained approval for the penalties. The partnership cannot now be heard on appeal to contend that any procedural requirements imposed by §§ 6751 and 7491 are jurisdictional and incapable of being waived, and we see nothing in these statutes precluding waiver. See *Chai v. Commissioner*, 851 F.3d 190, 222 (2d Cir. 2017) (holding that the written-approval requirement is appropriately viewed as an element of a penalty claim, but not a component of subject matter jurisdiction); accord *Kaufman v. Commissioner*, 784 F.3d 56, 71 (1st Cir. 2015) (similarly treating as waived a taxpayer's argument that the Commissioner failed to comply with the procedural requirements of § 6751). On this record, there was no procedural flaw in the Commissioner's imposition of penalties.

Turning to the merits of the penalties, under the standard that existed in 2004, a 40% gross-valuation misstatement penalty like the one the Commissioner imposed on Sugarloaf was permitted if the partnership's claimed basis in the uncollectible receivables was 400% percent or more of the actual basis. See 26 U.S.C. § 6662(h)(1) & (2)(A)(i) (2000 & Supp. IV 2004).

Sugarloaf claimed a basis in the uncollectible receivables that was roughly equal to their face value, and as a result, reported a cost-of-goods-sold expense of $122,950,000 after transferring the receivables to U.S. taxpayers. In reality, however, its actual basis in the receivables (as a matter of economic substance) was a small fraction of what it claimed—clearly satisfying the gross-valuation standard.

And a 20% penalty like the one the Commissioner imposed on Sugarloaf was permitted if the partnership was negligent or disregarded rules and regulations when it failed to include certain income and took impermissible deductions. See 26 U.S.C. § 6662(a), (b)(1) & (2). This standard, too, is clearly satisfied given Sugarloaf's failure to reasonably explain why certain income was omitted or to substantiate the disallowed deductions, as well as its, in the Tax Court's words, "scanty to nonexistent, and noncontemporaneous" recordkeeping.

If Sugarloaf could establish that it had "reasonable cause" and "acted in good faith" when reporting its income, it could have avoided these penalties. 26 U.S.C. § 6664(c)(1); see *United States v. Boyle*, 469 U.S. 241, 250–51 (1986). In *Superior Trading* we observed that "there is not even a colorable basis for the tax shelter that [Rogers] created." Just as there was no colorable basis then, there certainly is no colorable basis now, such that the Tax Court did not clearly error when it found Sugarloaf could not avail itself of the reasonable-cause defense. The assessed penalties were proper.

For these reasons, we AFFIRM.