# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 18, 2020       Decided March 23, 2021

No. 19-1068

BCP TRADING AND INVESTMENTS, LLC, ET AL.,
APPELLANTS

v.

COMMISSIONER OF INTERNAL REVENUE,
APPELLEE

VIRGINIA SIMPSON,
APPELLANT

Consolidated with 19-1072, 19-1098, 19-1099, 19-1122,
19-1123

Appeals from the United States Tax Court

*Jeremy C. Marwell* argued the cause for appellants Kalkhoven-Pettit Partnerships. *George M. Clarke III* argued the cause for appellants Esrey-LeMay Partnerships. With them on the briefs were *Mireille R. Oldak*, *Vivek A. Patel*, *Robert E. McKenzie*, *Kathleen M. Lach*, *Matthew X. Etchemendy*, *Michael L. Charlson*, and *David C. Cole*.

*Virginia Simpson*, pro se, filed the brief for appellant Virginia Simpson.

*Jennifer M. Rubin*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief was *Joan I. Oppenheimer*, Attorney.

Before: SRINIVASAN, *Chief Judge*, HENDERSON and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: In January 2008, the Commissioner of the Internal Revenue Service (Commissioner) issued tax adjustments to the partnership of BCP Trading & Investments, LLC (BCP) for tax years 2000 and 2001. Members of BCP—themselves limited partnerships—challenged the adjustments, arguing they were untimely and that the Commissioner mistakenly determined that the investment partnership was a sham. The United States Tax Court found the adjustments timely because the three-year statute of limitations for the adjustments was extended by the partnership and its members and those extensions, contrary to BCP's members' challenges, were consistent with fiduciary and contract principles. The Tax Court upheld the Commissioner's adjustments, declaring the partnership a sham for tax purposes. Virginia Simpson, a non-participating party, moved to intervene after the Tax Court issued its memorandum opinion and findings of fact but before it issued its final decisions. The Tax Court denied her intervention in a separate order.

Before us is a consolidated appeal of the Tax Court's opinion and final decisions regarding the Commissioner's adjustments issued to BCP as well as its order denying intervention. The Tax Court applied correct legal precedent and committed no clear error in its findings upholding the

Commissioner's tax adjustments. Nor did the Tax Court abuse its discretion in denying Simpson's intervention. Accordingly, we affirm.

## I.   BACKGROUND[1]

As with many cases arising from the Tax Court, "[t]he hardest aspect of this case is simply getting a handle on the facts." *ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 506 (D.C. Cir. 2000). Because a chronological retelling of the story may confuse more than enlighten, we start with the actors involved and then address the intricacies of the transaction at issue.

### A.   The Actors

The hub around which all of the actors revolve is BCP. BCP was a partnership and during its brief life had 39 members. At BCP's helm was its managing member, a limited liability company, Bolton Capital Planning, LLC (Bolton Capital). Charles Bolton owned and operated Bolton Capital and Belle Six worked for Bolton Capital. Six, Bolton's partner in crime,[2] was a former employee of the global accounting firm Ernst & Young (E&Y). BCP's other 38 members ("client members") were limited liability companies and limited partnerships and all were clients of E&Y. Two groups of client members—all limited partnerships—are relevant to this appeal: (1) KP1, KP2 and PCMG XII and (2) WTETP and PCMG VI.

---

[1]  We address the relevant facts and law of Simpson's failed intervention in Part III, *infra* at 31. All facts come from the stipulations and other evidence before the Tax Court.

[2]  Six and Bolton both pleaded guilty to tax crimes in connection with their tax shelter activities.

Kevin Kalkhoven and Dan Pettit were limited partners in the KP1, KP2 and PCMG XII limited partnerships. They were both executives at JDS Uniphase Corporation and they hired E&Y in the 1990s to manage their tax matters. Their relationship with E&Y grew from tax matters to include much of their personal financial affairs. Jim Cox of E&Y managed both Kalkhoven's and Pettit's business matters.

William Esrey was a limited partner in WTETP and Ronald LeMay was a limited partner in PCMG VI. Esrey and LeMay were executives at Sprint Corporation; Sprint required them to use E&Y to prepare their tax returns and E&Y prepared their tax returns beginning in the 1980s. Over the years both Esrey's and LeMay's relationship with E&Y evolved from tax preparation to estate, financial and tax planning—Mike Carr of E&Y served as Esrey's and LeMay's point of contact.

### B.   The Actors' Business Relationships

In 1999 Six left E&Y to join The Private Capital Management Group (TPCMG) to help TPCMG market an E&Y-promoted financial transaction called a Contingent Deferred Swap (CDS). CDS transactions defer taxes on ordinary income by one year and transform the ordinary income into capital gains, which are taxed at a lower rate than ordinary income. Through their respective limited partnerships, Kalkhoven, Pettit, Esrey and LeMay (Taxpayers) engaged in CDS transactions with TPCMG in 1999. In late 1999 or early 2000, TPCMG transferred the CDS business to Bolton. Six joined Bolton to continue to market the CDS transactions and act as liaison between Bolton and E&Y.

To offset the capital gains taxes generated from the CDS transactions, E&Y created a new transaction—the transaction at issue in this case—known as the CDS Add-On or CDS Plus (Add-On). E&Y's Carr and Bolton Capital's Six described the

Add-On to Esrey and LeMay and both Esrey and LeMay decided to participate. E&Y and Bolton Capital's Six also presented the Add-On to Kalkhoven and Pettit and both decided to participate. In May 2000, on E&Y's advice, Bolton Capital formed BCP to execute the Add-On. Between 2000 and 2001 BCP client members—including the Taxpayers' limited partnerships—engaged in the E&Y-designed Add-On.

Under the United States Tax Code, partnerships do not pay federal income tax. I.R.C. § 701.[3] Instead, partnerships file an annual information return reporting each partner's share of income, gain, loss, deductions and credits. *Id.* §§ 702, 6031. The partners report their individual shares of income, gain, loss, deduction or credit on their individual federal income tax returns and taxes are assessed against the partners individually. *Id.* §§ 701, 702, 704. If the IRS disagrees with a partnership's reporting, it issues a Final Partnership Administrative Adjustment (FPAA) before imposing tax assessments against the individual partners. *Id.* §§ 6223(a)(2), (d)(2), 6225(a). The IRS must assess tax attributable to partnership items[4] within three years of the date the partnership return is filed or the last date for filing the return, whichever is later. *Id.* § 6229(a). If the three-year period has not yet expired, the IRS may seek to extend it, using either of two "statute extensions." *Id.*

---

[3] Unless otherwise noted, references to the Internal Revenue Code are those in effect at the time relevant to these cases.

[4] A "partnership item" is "any item required to be taken into account for the partnership's taxable year under any provision of [the Internal Revenue Code's Income Tax subtitle] to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level." I.R.C. § 6231(a)(3). "[A] determination that a partnership lacks economic substance is an adjustment to a partnership item." *United States v. Woods*, 571 U.S. 31, 39 (2013).

§ 6229(b). The IRS may obtain an extension from the partner whose individual tax return may be affected. *Id.* § 6229(b)(1)(A). Alternatively, the IRS may ask the tax matters partner (TMP) of the partnership to consent to an extension to allow the IRS to assess any taxes attributable to partnership items of all partners. *Id.* § 6229(b)(1)(B).

The IRS obtained a timely partnership extension for tax year 2000 from Bolton, BCP's TMP, on January 6, 2004 (Partnership Extension). Bolton subsequently executed eight more partnership extensions—the last on April 2, 2007— extending the liability period for tax years 2000 and 2001 through June 30, 2008. The IRS also obtained timely individual extensions from Kalkhoven, Pettit, Esrey and LeMay (Individual Extensions). As relevant here, Pettit and Kalkhoven signed Individual Extensions for tax year 2000 on November 17 and November 20, 2003, respectively, and both again did so on September 27, 2004. Esrey and LeMay signed Individual Extensions for tax year 2000 on December 4, 2003 and January 26, 2004, respectively. The Taxpayers continued to sign individual extensions, extending their tax liability for tax years 2000 and 2001 through at least December 31, 2008.

While the IRS sought the Partnership and Individual Extensions, E&Y was actively advising BCP and the Taxpayers and representing the Taxpayers before the IRS. E&Y's Cox advised Kalkhoven and Pettit to consent to the Individual Extensions and did not discuss any extension downside with them. Similarly, E&Y's Carr advised Esrey and LeMay to authorize individual extensions. E&Y also advised BCP to sign the Partnership Extension. Six wrote to the Taxpayers, informing them that Bolton Capital planned to sign the Partnership Extension "[b]ased on Ernst & Young's . . . recommendation . . . unless we hear otherwise from you." Joint Appendix (J.A.) 725.

Around the same time E&Y was the subject of several civil and criminal investigations. As a brief overview, by 2002 E&Y knew the IRS was auditing CDS transactions. In March 2002, E&Y became the subject of an IRS "civil promoter" audit to determine if E&Y had failed to disclose tax shelters.[5] That audit was settled in July 2003. In May 2004, a grand jury investigation began to examine E&Y's tax shelters.

On January 31, 2008, the IRS issued FPAAs against BCP for tax years 2000 and 2001. In the FPAAs, the IRS determined BCP was a "sham" and should be disregarded for tax purposes. The Taxpayers, through their partnerships, challenged the FPAAs in Tax Court. First, the Taxpayers argued the FPAAs for tax year 2000 were untimely because the Individual Extensions and Partnership Extension upon which any subsequent tax year 2000 extensions rested were voidable under agency and contract law. The Taxpayers also argued that BCP was a bona fide partnership because it had a valid business purpose. In August 2013 Tax Court Judge Diane Kroupa presided over the trial but Judge Kroupa retired after trial and the case was reassigned to Tax Court Judge Mark Holmes. In August 2017 the Tax Court issued its findings of fact and memorandum opinion, concluding the extensions were valid and that BCP "was created to carry out a tax-avoidance scheme" and should therefore be "disregard[ed]" for tax purposes. *BCP Trading & Invs., LLC v. Comm'r*, 114 T.C.M. (CCH) 151, 2017 WL 3394123, at *21 (2017). On February 6, 2019, the Tax Court issued its order denying intervention. J.A.

---

[5] I.R.C. §§ 6111 and 6112 require a tax shelter organizer to register a qualifying tax shelter with the IRS and provide certain information regarding it. I.R.C. §§ 6707 and 6708 impose penalties on anyone who fails to register or provide the applicable information on a qualifying tax shelter.

2482. And on February 7, 2019, it issued two decisions implementing its August 2017 opinion. J.A. 2488–89.

## C. The Challenged Add-On[6]

The Add-On consisted of several intermediate steps. To begin, BCP client members purchased 132 option pairs between July 19 and August 11, 2000. Both options in the pair were digital options. A digital option is a type of option contract that pays the option holder a fixed payout if the underlying asset's price equals or exceeds a predetermined price (strike price) by a predetermined expiration date.[7] If the underlying asset's price does not reach the strike price by the expiration date, the option expires worthless. Here, the underlying asset in each digital option pair was a foreign currency.

As a "European-style" option, the underlying asset's price is evaluated to determine whether an option pays out or expires worthless only on the predetermined expiration date and time. The asset's price at expiration is the spot price or spot rate. Accordingly, on the option's expiration date and time, the spot price is compared to the strike price. If the spot price meets or exceeds the strike price, the option pays out but if the spot price does not meet or exceed the strike price, the option expires worthless. All options began "out of the money"—at the time each option was purchased, the currency price did not already

---

[6] Our description of the Add-On follows the Commissioner's brief, *see* Appellee's Br. at 4–26, and the Tax Court's opinion, *see* *BCP*, 2017 WL 3394123, at *3–*6.

[7] Here, we describe the 124 option pairs that required positive price movement relative to the strike price, not the eight option pairs that required negative price movement.

exceed the strike price but upward price movement was necessary for them to pay out and not expire worthless.

Each option pair included an option which the client member bought from Refco Capital Markets (Refco) (referred to as the "long" option) and an option which the client member sold to Refco (referred to as the "short" option). The long and short options in each pair had a one "percentage in point" (pip) difference in strike price. A pip is the smallest pricing increment in foreign exchange markets and for many currencies it is 1/100th of a cent. With a spread only one pip wide, typically the spot prices fall short of both strike prices (and both options in the pair expire worthless) or exceed both strike prices (and both options in the pair pay out). As envisioned, if the spot price exceeded both strike prices, Refco owed the predetermined payout on the long option to the client member *and* the client member owed the predetermined payout on the short option to Refco. But the payout to the client member on the long option always exceeded the payout to Refco on the short option; Refco then paid the client member the difference between the two. Accordingly, if both options expired "in the money" with the spot price above the strike price, only the client member (not Refco) received the net payout.

How the Add-On functioned may be best understood by one transaction. PCMG XII bought and sold into an option pair with Refco on July 31, 2000. Both the long and short options in the pair expired on November 30, 2000. The option pair's underlying asset was the reference exchange rate of Canadian Dollars (CAD) per United States Dollar (USD). The long option's strike price was an exchange rate of 1.5075 and the short option's strike price was an exchange rate of 1.5076. If the spot price (i.e., the reference exchange rate on November 30, 2000) equaled or exceeded the long option's strike price of

1.5075, Refco paid PCMG XII $170 million. On the other hand, if the spot rate equaled or exceeded the short option's strike price of 1.5076, PCMG XII paid Refco $169.5 million. If the spot rate was above both strike prices, PCMG XII received a net payment of $500,000. If the spot price was below both strike prices, both options expired worthless.

If the spot rate landed within the one pip spread—the "sweet spot"—client members received a "lottery payoff" because Refco had to pay out on the long option but the client members did not have to pay out on the short option. In our example, if the spot rate had landed at 1.5075 or between 1.5075 and 1.5076, Refco would have paid PCMG XII $170 million but PCMG XII would not have paid Refco $169.5 million. The likelihood of the spot rate falling within the one pip spread was miniscule. Not only was the spread just one pip wide but the option pairs were custom. A custom option is not listed or traded on any exchange. Accordingly, there are multiple different expiration-day spot prices for the same currency depending on which bank or broker Refco dealt with. Refco had the discretion to choose between those spot prices for settling the option pairs, so long as it acted "in good faith and in a commercially reasonable manner." J.A. 90. Refco had both an incentive not to let an option pair hit the sweet spot and the discretion to keep it from doing so.[8]

---

[8] Refco's incentive to enter the option pair contracts came from the option premiums. The client members paid a purchase premium to Refco on each long option and Refco paid a sale premium to the client members on each short option. The purchase premium exceeded the sale premium and the client members paid Refco the net difference between the premiums (total premium). In our example, PCMG XII's purchase premium to Refco was $51,000,000. Refco's sale premium to PCMG XII was $50,750,787. Accordingly,

Between July 31 and August 11, 2000, the client members contributed the option pairs to BCP—transferring the assets from the client member's ownership to BCP's. In return, each client member was credited with a BCP capital account equal to the amount of the total premium paid on its contributed options. Subsequently, every option pair either expired worthless or was sold before its expiration date for less than the total premium paid. Accordingly, BCP's portfolio appeared to lose significant value.

E&Y advised the client members to terminate their interest in BCP in the year they chose to claim losses. All client members, including the Taxpayers' respective partnerships, withdrew from BCP between 2000 and 2001. Upon leaving BCP, client members, including the Taxpayers, were paid in Japanese yen in an amount equal to their remaining capital account less expenses and fees. A client member triggered its losses by liquidating its position in BCP and selling the yen.

Client members claimed an outside basis[9] in their yen of an amount equal to the assets they contributed to BCP—their long option premiums—but did not reduce the basis by contingent liabilities BCP assumed—their short options. Because the short option liabilities were not fixed at the time of transfer—they were out of the money and there was not an obligation to pay on them unless, at expiration, they were in the money—the partnership treated them as uncertain and ignored them in computing the partners' outside bases. Accordingly,

---

PCMG XII paid Refco the total premium: $249,213. Whether the options expired worthless or paid out, Refco kept the total premium.

[9] "Outside basis" is "[a] partner's tax basis in a partnership interest." *Woods*, 571 U.S. at 35–36. Outside basis "functions as a proxy for the value of the assets . . . contributed" to a partnership. *Petaluma FX Partners, LLC v. Comm'r*, 792 F.3d 72, 75 (D.C. Cir. 2015).

when the Taxpayers sold their yen, it appeared they had sustained massive losses. For example, after liquidating its interest in BCP, PCMG XII received $478,748 worth of yen. PCMG XII claimed a basis of $709,108,965—PCMG XII's long option premiums—in the yen. That is, PCMG XII claimed the value of the assets it contributed to BCP was $709,108,965, notwithstanding PCMG XII had paid a total premium of only $3,354,857 for the option pairs it contributed to BCP. When PCMG XII sold its yen—representing all that remained of the assets PCMG XII had contributed to BCP—it appeared that the value of the assets PCMG XII had contributed to BCP decreased from over $700 million to $478,748. The Taxpayers then used the losses generated from the Add-On to substantially offset their income and reduce their taxes.[10]

After the 2001 distributions, BCP had no assets or liabilities, its only remaining member was its managing member, Bolton Capital, and BCP dissolved in June 2002. The Commissioner contends the Add-On is a type of tax shelter known as a Son-of-BOSS shelter, described by the Tax Court as a series of steps whereby the taxpayers

> transfer . . . assets encumbered by significant liabilities to a partnership, with the goal of increasing basis in that partnership. The

---

[10] For example, for the tax year 2000, Kalkhoven reported salary income of $492,523,171 and capital gains of $35,399,233 but claimed combined losses of $533,578,758 from the three partnerships, reducing his federal tax liability to $2,746,074. In other instances, the Taxpayers even received tax *refunds* in the millions of dollars. For tax year 2000, the Esreys reported salary income of $83,724,716 and capital gains of $123,058,888 but, using a total loss of $462,205,971 from the partnerships, reduced their tax liability to $14,446 attributable to self-employment taxes, which resulted in a $5,261,538 refund.

> liabilities are usually obligations to buy securities, and typically are not completely fixed at the time of transfer. This may let the partnership treat the liabilities as uncertain, which may let the partnership ignore them in computing basis. If so, the result is that the partners will have a basis in the partnership so great as to provide for large—but not out-of-pocket—losses on their individual tax returns.

*BCP*, 2017 WL 3394123, at *1 n.2. As explained *infra*, the Tax Court agreed with the Commissioner's contention.

## II. ANALYSIS

Tax Court decisions are reviewed "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." I.R.C. § 7482(a)(1). Accordingly, questions of law are reviewed *de novo* and factual findings for clear error. *Andantech LLC v. Comm'r*, 331 F.3d 972, 976 (D.C. Cir. 2003). Mixed questions of law and fact are treated as questions of fact and reviewed for clear error. *Id.* Under clear error review, we assess the Tax Court's findings under "all the evidence of record," *Daniels v. Hadley Mem'l Hosp.*, 566 F.2d 749, 757 (D.C. Cir. 1977), and "may overturn the Tax Court's . . . findings only if we come to a 'definite and firm conviction that a mistake has been committed,'" *Endeavor Partners Fund, LLC v. Comm'r*, 943 F.3d 464, 467 (D.C. Cir. 2019) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Clear error occurs if a finding is based on a "serious mistake as to the effect of evidence or is clearly contrary to the weight of the evidence." *Daniels*, 566 F.2d at 757 (footnotes omitted).

The Taxpayers first argue the Tax Court clearly erred in its ruling that the extensions were valid because the Tax Court

misunderstood the facts and failed to apply them under the correct legal standards. Next, the Taxpayers challenge the Tax Court's sham determination because it allegedly applied an incorrect legal standard and clearly erred in its fact-finding. Granted, the Tax Court opinion is at times unclear or its reasoning is cursory. But such flaws do not *per se* establish clear error. *See ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 511, 515 (D.C. Cir. 2000) (no clear error by Tax Court although some "reasoning seem[ed] misdirected" and at times its "focus . . . was a little puzzling"). Viewing the record as a whole, we cannot come to a "definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395, nor do we conclude that the Tax Court applied an incorrect legal standard.[11]

## A. The Statute Extensions

In Tax Court, the Taxpayers argued that the January 2004 Partnership Extension and the 2003/2004 Individual Extensions were voidable under fiduciary and contract law; further, the limitations period governing adjustments for the 2000 tax year expired before the adjustments issued because extensions for that year were obtained outside the three-year

---

[11] We recognize that "the presumption of correctness that attaches to factual findings is stronger in some cases than in others." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500 (1984). Even though the presumption may have "lesser force" here because Judge Holmes was not the trial judge and his "findings [were] based on documentary evidence," not live testimony, our determination remains unaffected. *Id.* Judge Holmes "demonstrate[d] that he complied with [Federal Rule of Civil Procedure] 63's basic requirement: that a successor judge become familiar with relevant portions of the record." *Mergentime Corp. v. Washington Metro. Area Transit Auth.*, 166 F.3d 1257, 1265 (D.C. Cir. 1999).

limitations period. An FPAA is timely if either an individual extension or the Partnership Extension is valid. The Taxpayers' arguments that the extensions are void start from the same general proposition: when the IRS sought the Partnership Extension and Individual Extensions, E&Y had a conflict of interest due to the civil and criminal investigations it was facing, E&Y breached its duty to the Taxpayers because E&Y never disclosed that conflict and the IRS ignored and facilitated E&Y's breach—ultimately benefitting from the breach by securing the extensions. The Tax Court found that the Taxpayers' arguments failed irrespective of any E&Y conflict or breach of duty to the Taxpayers. We agree with the Tax Court, as we now explain.

1.   The Partnership Extension and Bolton's Fiduciary Role

Principles of agency and fiduciary law apply to extensions. *See Transpac Drilling Venture 1982-12 v. Comm'r*, 147 F.3d 221, 225 (2d Cir. 1998). And under fiduciary law, "the transactions of those who knowingly participate with [a] fiduciary in . . . a breach are 'as forbidden' as transactions 'on behalf of the trustee himself.'" *Dirks v. SEC*, 463 U.S. 646, 659 (1983) (quoting *Mosser v. Darrow*, 341 U.S. 267, 272 (1951)); *see also United States v. Dunn*, 268 U.S. 121, 132 (1925) ("he who fraudulently traffics with a recreant fiduciary shall take nothing by his fraud"). Here, if the IRS knowingly trafficked with a breaching fiduciary to obtain the extensions, it cannot benefit from them.

In concluding that the Partnership Extension is valid under fiduciary principles, the Tax Court focused on Bolton as the relevant fiduciary because he, not E&Y, signed the Partnership Extension as the Taxpayers' fiduciary. *BCP*, 2017 WL 3394123, at *14. We find no fault in that focus. *See In re Martinez*, 564 F.3d 719, 735 (5th Cir. 2009) ("the IRS's ability

to deal with a [TMP] and rely on his actions on behalf of the partnership is critical for the effective operation of the current tax system"). The transaction at issue was between Bolton—acting on behalf of the Taxpayers as their fiduciary—and the IRS.

The Tax Court distinguished the facts *sub judice* from those in a leading Second Circuit case. *BCP*, 2017 WL 3394123, at *14 (citing *Transpac*, 147 F.3d at 221). The issue in *Transpac* was "whether, as a result of being placed under criminal investigation by the IRS (and hence becoming subject to pressure by the IRS), the [TMPs] labored under a conflict of interest and thereby were disqualified from binding the partnerships." 147 F.3d at 222. The IRS sought and obtained partnership extensions from the TMPs—who were at that time under criminal investigation—after the limited partners refused to sign individual extensions. *Id.* at 224. The TMPs cooperated with the criminal investigation and were granted immunity or offered suspended sentences by the prosecution. *Id.* at 223. Because the IRS knew the TMPs had a "powerful incentive to ingratiate themselves to the government," they operated under disabling conflicts and the IRS could not rely on their consent to bind the limited partners. *Id.* at 227.

As the Tax Court recognized, this case is readily distinguishable from *Transpac*. Bolton, as the TMP, was not under criminal investigation at the time he signed the Partnership Extension. Apparently, Bolton did not begin to worry about potential criminal liability until two years after he signed the January 2004 Partnership Extension. Accordingly, the IRS had no reason to believe it was dealing with a breaching fiduciary when it obtained Bolton's consent to the Partnership Extension. And unlike in *Transpac*, the Taxpayers did not rebuff the IRS's request for individual extensions—in fact, all of the Taxpayers signed Individual Extensions. The Taxpayers

contend their agreement is tainted because they could not have made an informed decision as to any extension without knowing of E&Y's conflict. But the Taxpayers' acquiescence does inform whether *the IRS* had reason to know Bolton was a breaching fiduciary when it obtained the Partnership Extension from him.[12]

2.     The Partnership and Individual Extensions and Contract Law

Although a statute extension is not a contract, "[c]ontract principles are significant" in evaluating it because I.R.C.

---

[12] The Taxpayers also argue the transaction between Bolton as their fiduciary and the IRS is invalid because the IRS dealt with E&Y in order to secure the Partnership Extension. But this argument would require E&Y's authority to secure the Partnership Extension either through the Taxpayers or Bolton—and for the IRS to know that. Evidence suggests that Six solicited input from the Taxpayers on the Partnership Extension, J.A. 153–54, but there is no evidence the IRS knew that. And the Taxpayers' focus on Bolton himself fails as well. Indeed, the Tax Court found the Taxpayers' argument that E&Y "embedded" Six in BCP unconvincing because Six left E&Y for "messy personal reasons." *BCP*, 2017 WL 3394123, at *14. Although the Tax Court's finding is brief, we do not believe it clearly erred in finding E&Y did not have the influence to secure the Partnership Extension through Bolton or that the IRS knew of E&Y's influence, if any. The communications between the IRS and E&Y regarding Bolton's consent to the Partnership Extension are equivocal regarding E&Y's influence over Bolton such that the IRS knew E&Y was the real party securing the extension. *Compare* J.A. 815–16 (E&Y told the IRS it "request[ed]" Bolton to sign the Partnership Extension), *with* J.A. 560 (IRS agent noted E&Y partner said he "had the [TMP] designation signed and the statute extensions"). In our view, E&Y's bare "request" of Bolton does not establish that the IRS knew that E&Y in fact had influence over Bolton.

§ 6501(c)(4) "requires that the parties reach a written agreement as to the extension" and an agreement "means a manifestation of mutual assent." *Piarulle v. Comm'r*, 80 T.C. (CCH) 1035, 1042 (1983). Accordingly, the Tax Court applies "general contract principles in interpreting, applying and deciding the enforceability of waiver documents." *Chai v. Comm'r*, 102 T.C.M. (CCH) 520, 2011 WL 5600287, at *2 (2011).

The Taxpayers argue that the challenged extensions are invalid under the contract principles of misrepresentation and undue influence. Generally, misrepresentation is "an assertion that is not in accord with the facts" or a material non-disclosure. Restatement (Second) of Contracts §§ 159, 161. And undue influence is the "unfair persuasion of a party . . . who by virtue of the relation between [the party and the persuader] is justified in assuming that [the persuader] will not act in a manner inconsistent with his welfare." *Id.* § 177(1). The extent of unfair persuasion "depends on a variety of circumstances," including the "unavailability of independent advice." *Id.* cmt. b. A contract is voidable if a party's manifestation of assent is induced by a non-party's misrepresentation or undue influence unless the counterparty "in good faith and without reason to know" of the non-party's misrepresentation or undue influence "gives value or relies materially on the transaction." *Id.* §§ 164, 177(3).

Six informed the Taxpayers that Bolton planned to sign the Partnership Extension based on E&Y's advice and that it would be signed unless Bolton Capital heard from them. And E&Y advised each Taxpayer to sign his Individual Extension. Accordingly, if the Taxpayers' assent to any extension was due to E&Y's misrepresentation or undue influence, the extension could be voidable. Importantly, however, for the Taxpayers to

void the extensions under either contract theory, they must have justifiably relied on E&Y. *Id.* §§ 164(2), 177(1).

### *i. Esrey and LeMay*

In its Partnership Extension analysis, the Tax Court stated that the "problem" with the Taxpayers' contract argument was that E&Y was not their "only adviser and they all had ample reason to question E&Y long before 2004" when the Partnership Extension was signed. *BCP*, 2017 WL 3394123, at *15. In other words, the Taxpayers were less likely to be unduly influenced because they had other advisors. And, in any case, they could not justifiably rely on E&Y because, by the time the Partnership Extension was signed, they should have questioned E&Y's good faith—whether or not they knew of E&Y's specific conflicts.

To support its ruling that the January 2004 Partnership Extension was valid as to Esrey and LeMay, the Tax Court relied on several facts. In 2000, Esrey and LeMay hired the King & Spalding law firm to evaluate the Add-On. The law firm ultimately "questioned whether [the Add-On] could get through an audit." *Id.* In 2002, LeMay informed E&Y that he and Esrey had hired King & Spalding for its independent views and instructed E&Y to consult with the firm on "all strategic matters." J.A. 538–39. In 2003, LeMay learned from a newspaper reporter that the IRS was investigating E&Y as a tax shelter promoter. The Tax Court found it "more likely than not," given their relationship, that LeMay informed Esrey about the reporter's information. *BCP*, 2017 WL 3394123, at *15. And in May 2004, Esrey and LeMay hired outside counsel to represent them in dealing with the IRS.

The Tax Court concluded that Esrey's and LeMay's contract argument as to their Individual Extensions "doesn't work for the same reason it didn't work for the partnership-

level extension." *Id.* Accordingly, the Tax Court relied on the same facts to support its holding that Esrey's and LeMay's Individual Extensions—signed in December 2003 and January 2004, respectively—were valid agreements under contract law. The Tax Court added that both Esrey and LeMay knew that E&Y was being investigated because E&Y told them and both Esrey and LeMay were "sophisticated businessmen." *Id.*

We agree with the Tax Court. As early as 2000, King & Spalding put Esrey and LeMay on notice that something could be amiss with E&Y's tax strategies. The Tax Court found that King & Spalding had "questioned" whether the Add-On would survive an audit. *Id.* Esrey testified that King & Spalding told them both "the IRS had the better part of the argument" regarding E&Y's tax strategies' legitimacy. J.A. 1607–08. Even before hiring King & Spalding, LeMay was "beginning to get a little insecure about [his] lack of knowledge" regarding E&Y's tax strategies after he read a news article discussing IRS challenges to Son-of-BOSS tax shelters; he and Esrey then decided to consult King & Spalding for advice. J.A. 858–59.

Knowledge of the civil promoter audit was another reason Esrey and LeMay should have questioned E&Y's actions. In 2003 LeMay was contacted by a national newspaper and asked whether the promoter audit affected him. LeMay contacted E&Y and E&Y told him the settlement was unrelated to him. LeMay also read the press release regarding E&Y's settlement of the promoter audit. The Tax Court's inference that LeMay likely told Esrey about the call is reasonable, considering Esrey admitted he and LeMay "talk[ed] . . . frequently and share[d] each other's thoughts or opinions" regarding press reports on E&Y's tax shelters. J.A. 855–56.

That Esrey and LeMay were sophisticated businessmen is also relevant in evaluating whether either was justified in

relying on E&Y. *See* Restatement (Second) Contracts § 177 ill. 1 ("experience[] in business" relevant to whether one is "justified in assuming" individual he "rel[ied] [on] in business matters" will not act in manner inconsistent with his welfare). Sophisticated businessmen who hire a global accounting firm to prepare their tax returns should not rely unquestioningly on that firm once they have direct knowledge of IRS scrutiny of the firm's tax strategies.[13]

### ii. Kalkhoven and Pettit

As with Esrey and LeMay, the Tax Court concluded that Kalkhoven and Pettit could not rely on misrepresentation or undue influence to nullify the Partnership Extension because E&Y was not their "only adviser and they all had ample reason to question E&Y long before 2004." *BCP*, 2017 WL 3394123, at *15. In May 2002 E&Y advised Kalkhoven and Pettit that E&Y was delivering requested documents to the IRS related to "certain transactions in which [they] were involved" and invited them to contact E&Y's outside counsel with any questions. *Id.* Eventually, in September 2004, Kalkhoven and Pettit hired the Fulbright & Jaworski and Vinson & Elkins law

---

[13] We do believe, however, that the Tax Court's reliance on Esrey's and LeMay's hiring of outside counsel in May 2004 is misplaced. Counsel hired in May *2004* has no bearing on whether Esrey and LeMay justifiably relied on, or were unduly influenced by, E&Y when the relevant extensions had been signed. And we, like the Taxpayers, are unsure what the Tax Court meant when it noted that E&Y told Esrey and LeMay that prosecutors were investigating it because there does not appear to be record evidence to support that notation—at least no record evidence to support that disclosure having been made before the relevant extensions were signed. Regardless, the evidence the Tax Court utilized to support its timeliness holding predates Esrey's and LeMay's execution of their Individual Extensions and their approval of the Partnership Extension.

firms to represent them in dealing with the IRS. And while these firms represented Kalkhoven and Pettit, Bolton continued to sign Partnership Extensions through April 2007.

Regarding Kalkhoven's and Pettit's Individual Extensions—signed in September 2004[14]—the Tax Court similarly pointed to the fact that the two executives were then represented by Fulbright & Jaworski and Vinson & Elkins. And when they signed the extensions, both knew of E&Y's conflicts because E&Y had already sent the Add-On clients to Fulbright & Jaworski because of those conflicts. E&Y also told Kalkhoven and Pettit in August 2002 that it was subject to a promoter audit regarding CDS and to contact its law firm of McKee Nelson with any questions.

The Tax Court's findings here were not error. Granted, the fact that Kalkhoven and Pettit were represented by Fulbright & Jaworski and Vinson & Elkins by September 2004 says nothing about their reliance on, or the undue influence wielded by, E&Y with respect to the *January 2004* Partnership Extension. But that Fulbright & Jaworski represented them does inform whether they justifiably relied on E&Y in executing their *September 2004* Individual Extensions. Kalkhoven and Pettit signed letters of engagement with Fulbright & Jaworski on the same day they signed their individual extensions. But E&Y had recommended that their clients transition to Fulbright & Jaworski in August 2004 due to the conflict of interest stemming from the May 2004 grand jury investigation. The Tax Court inferred that Kalkhoven and Pettit had received the letter because they hired the firm E&Y suggested in the letter. Before hiring Fulbright & Jaworski, Pettit had signed an

---

[14] Because the three-year limitations period had not expired when Kalkhoven and Pettit signed their second Individual Extension for tax year 2000 in September 2004, the Tax Court used the September 2004 extensions as the operative ones.

engagement letter with Vinson & Elkins in March 2004, well before his September 2004 Individual Extension.

Moreover, E&Y's May 2002 letter also supports the Tax Court's determination that Kalkhoven and Pettit should have questioned E&Y's good faith. The letter informed them that the IRS had served E&Y with an administrative summons "demand[ing] the production of broad categories of documents and other information with regard to certain transactions in which [Kalkhoven and Pettit] were involved" and that E&Y intended to comply. J.A. 544–45. Another letter—in August 2002—noted that the IRS was again examining E&Y transactions via an administrative summons. Importantly, it noted that the request related to the CDS transactions. Granted, CDS was different from the Add-On but they were related transactions in that Add-On was designed to eliminate capital gains taxes generated from the CDS transactions.

In November 2003, before the Partnership Extension or Kalkhoven's and Pettit's September 2004 individual extensions were signed, Kalkhoven and Pettit received consent and disclosure forms from E&Y. The consent form stated that E&Y believed it could continue to represent Kalkhoven and Pettit effectively. But it also stated the IRS had "taken the position that E&Y acted as a tax shelter promoter of CDS and [the Add-On] transactions" and noted several potential sources of conflicts, including that E&Y had settled the promoter audit and that individual E&Y personnel might be subject to sanctions and might seek to assert defenses inconsistent with their clients' interests. J.A. 885–88. The disclosure letter encouraged Kalkhoven and Pettit "to retain . . . independent counsel to work with [E&Y]." J.A. 713; J.A. 719. And it advised them that it was "rais[ing] . . . certain matters that could be deemed to constitute conflicts of interest under applicable ethical rules." J.A. 714; J.A. 720. Nonetheless

Kalkhoven and Pettit signed conflict waivers in November 2003—before the January 2004 Partnership Extension and their September 2004 Individual Extensions were executed.

In sum, the Tax Court outlined various events that occurred before the Taxpayers' Individual Extensions or the Partnership Extension were signed, all of which should have put the Taxpayers on notice that they should not rely on E&Y's advice any longer. Accordingly, we see no clear error in the Tax Court's findings.

## B. The "Sham" Determination

In general, a partnership "may be disregarded where it is a sham or unreal." *Moline Props., Inc. v. Comm'r*, 319 U.S. 436, 439 (1943); *see also ASA Investerings*, 201 F.3d at 512. And in a "sham" inquiry, "whether the 'sham' be in the entity or the transaction[,] . . . the absence of a nontax business purpose is fatal." *ASA Investerings*, 201 F.3d at 512; *see also Horn v. Comm'r*, 968 F.2d 1229, 1237 (D.C. Cir. 1992) ("extract[ing]" from economic substance and business purpose tests that transaction "will not be considered a sham if it is undertaken for profit *or* for other legitimate nontax business purposes"). Under the business purpose doctrine, "the Commissioner may look beyond the form of an action to discover its substance[;]" accordingly, although a "taxpayer may structure a transaction so that it satisfies the formal requirements of the Internal Revenue Code, the Commissioner may deny legal effect to a transaction if its sole purpose is to evade taxation." *ASA Investerings*, 201 F.3d at 513 (quoting *Zmuda v. Comm'r*, 731 F.2d 1417, 1420–21 (9th Cir. 1984)). Further, a partnership is not recognized as such for tax purposes unless "the parties

intended to join together as partners to conduct business activity for a purpose other than tax avoidance." *Id.*

The Taxpayers[15] argue that the Tax Court's determination that BCP was a "sham" partnership was flawed because it applied the incorrect legal standard and misunderstood the facts as they related to the correct standard. Because the Tax Court applied the correct legal standard and because, viewing the record as a whole, we come to no "definite and firm conviction that a mistake has been committed" in its findings, *U.S. Gypsum Co.*, 333 U.S. at 395, we affirm its sham determination.

## 1. Application of *Luna*

The Taxpayers first argue that the Tax Court erred in using the factors set out in *Luna v. Commissioner*, 42 T.C. 1067 (1964), to evaluate BCP because *Luna* is "analytically distinct" from the business purpose doctrine and focuses on the incorrect inquiry. *Luna* "distilled the principles" articulated in the United States Supreme Court's decisions in *Commissioner v. Tower*, 327 U.S. 280 (1946), and *Commissioner v. Culbertson*, 337 U.S. 733 (1949). *WB Acquisition, Inc. v. Comm'r*, 101 T.C.M. (CCH) 1157, 2011 WL 477697, at \*9 (2011), *aff'd*, 803 F.3d 1014 (9th Cir. 2015). In both *Tower* and *Culbertson*, the Supreme Court evaluated whether an existing partnership "is real within the meaning of the federal revenue laws." *Tower*, 327 U.S. at 290; *see also Culbertson*, 337 U.S. at 741. *Tower* established that the key analysis is intent: "whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or loses or both."

---

[15] In Tax Court only Kalkhoven and Pettit argued BCP was a legitimate partnership engaged in legitimate business. Esrey and LeMay conceded that the Add-On transactions were "bogus," J.A. 1619, and "outright frauds," J.A. 1762.

327 U.S. at 287. *Culbertson* explained that the intent inquiry is fact-intensive and describes factors to evaluate an intent to form a partnership. 337 U.S. at 742.

In *Luna*, the Tax Court considered whether the parties in a business relationship had informally entered into a partnership under the Tax Code, allowing them to claim that a payment to one party was intended to buy a partnership interest. *See* 42 T.C. at 1076–77. To determine whether the parties formed an informal partnership for tax purposes, the *Luna* Court asked "whether the parties intended to, and did in fact, join together for the present conduct of an undertaking or enterprise." *Id.* at 1077 (citing *Culbertson*, 337 U.S. at 733). *Luna* listed non-exclusive factors to determine whether the intent necessary to establish a partnership existed. *Id.* at 1077–78.[16]

The Taxpayers are correct that *Luna*'s intent inquiry is "analytically distinct" from the business-purpose doctrine but the two analyses are not mutually exclusive. *See, e.g.*, *Chemtech Royalty Assocs., LP v. United States*, 766 F.3d 453, 460–61 (5th Cir. 2014) (*Tower*/*Culberson* inquiry appropriate

---

[16] The *Luna* factors include: "The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise."

because "[t]he fact that a partnership's underlying business activities had economic substance does not, standing alone, immunize the partnership from judicial scrutiny [under *Culbertson*]" (internal quotations omitted)); *Historic Boardwalk Hall, LLC v. Comm'r*, 694 F.3d 425, 461 (3d Cir. 2012) (same); *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 230–32 (2d Cir. 2006) (district court erred in considering only partnership's "economic substance" and ignoring *Culbertson*'s "all-facts-and-circumstances test"). At least inferentially, we have recognized the *Luna* factors by describing the "basic inquiry" as "whether, all facts considered, the parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance." *ASA Investerings*, 201 F.3d at 513; *see also Andantech LLC v. Comm'r*, 331 F.3d 972, 978 (D.C. Cir. 2003) (citing *Culbertson*, 337 U.S. at 742–43). Accordingly, the *Luna* factors are appropriately applied to the intent inquiry. *See TIFD III-E*, 459 F.3d at 230–32 (*Luna* noted as one of multiple cases "identifying factors a court might consider" to evaluate whether partners joined partnership with requisite intent).

The Taxpayers argue that, if *Luna* is applicable, BCP satisfies its factors. But the Tax Court disagreed and did not clearly err in this "fact-intensive inquiry." *Saba P'ship v. Comm'r*, 273 F.3d 1135, 1140 (D.C. Cir. 2001). We agree with the Tax Court that "the agreement of the parties and their conduct in executing its terms" and "whether business was conducted in the joint names of the parties" weigh against finding BCP a partnership for tax purposes. *BCP*, 2017 WL 3394123, at *17 (quoting *Luna*, 42 T.C. at 1077). BCP's "business" was limited to one type of transaction: the Add-On. After accepting the options, BCP's only activities were settling paired options and paying distributions, plus paying minimal advisor fees. And the fees paid to E&Y and Bolton to

participate in the Add-On were based on the tax loss generated by the Add-On.

"[W]hether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise" also weighs against finding BCP to be a bona fide partnership. *Id.* (quoting *Luna*, 42 T.C. at 1078). Bolton Capital had an unusual amount of control over BCP. The operating agreement gave Bolton Capital "all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company." J.A. 269. The client members were not permitted "to take part in the management or control of the business or affairs of the Company, including, without limitation, voting to remove the Managing Member" or "have any voice in the management or operation of any Company property." J.A. 274. Further, Bolton Capital was either the "Managing Member, General Partner, . . . Tax Matters Partner . . . [or had] Power of Attorney" for every client member and Bolton signed the BCP operating agreement on behalf of every client member. J.A. 82. The Taxpayers note that limited partnerships controlled by one general partner are commonplace. But *Luna*'s multi-factor test emphasizes that the determination is fact intensive—the Tax Court validly found that Bolton's level of control was particularly unusual here.

Accordingly, the Tax Court correctly applied the *Luna* factors to determine "whether the parties intended to, and did in fact, join together for the present conduct of an undertaking or enterprise" and correctly concluded that BCP failed the *Luna* analysis. *BCP*, 2017 WL 3394123, at *17.

2.    The Business Purpose/Economic Substance Doctrines

Generally, an entity is considered a "sham" and disregarded for tax purposes if it is not "undertaken for profit *or* for other legitimate nontax business purposes." *Horn*, 968

F.2d at 1238 (applying economic substance and business purpose factors). Both the business purpose and economic substance doctrines "look beyond the form of an action to discover its substance." *ASA Investerings*, 201 F.3d at 513 (internal quotations omitted). Taxpayers are entitled to structure their business transactions "in such a way as to minimize tax" but the business purpose doctrine is not met if "such structuring is deemed to have gotten out of hand, to have been carried to such extreme lengths that the business purpose is no more than a facade." *Id.* The Taxpayers contend that BCP's formation was intended to achieve, and in fact did achieve, diversification—an "indisputably legitimate business purpose." Appellants' Br. at 67.

The Tax Court's determination that diversification was merely a "facade" is well supported by the record. *BCP*, 2017 WL 3394123, at *19. Granted, the record contains conflicting evidence. Some testimony suggests diversification was a goal of BCP—for example, Bolton stated he believed pooling of the partners' assets in BCP would provide diversification and E&Y told Kalkhoven the pooling of foreign currency investments in BCP would achieve diversification. But other testimony suggests any non-tax motive was fabricated. Six stated that she was not aware of any non-tax reason for contributing the option pairs to BCP and Bolton "helped fabricate a non-tax motivation used to falsely explain why clients participated in the CDS Add-On shelter." J.A. 596. The Tax Court's rejection of Kalkhoven's and Pettit's testimony on diversification as "not credible and inconsistent with the objective facts" is also well supported by the record. *BCP*, 2017 WL 3394123, *19 n.22. Both Kalkhoven and Pettit admitted they did not know what the Add-On was and did not even know their investments were part of the Add-On—they simply testified that, as part of a

broad investment plan, they invested with Bolton Capital to diversify.

Although a finance/economics professor gave expert testimony that pooling of the option pairs achieved diversification, the Tax Court must "look beyond the form of [the] action to discover its substance." *ASA Investerings*, 201 F.3d at 513 (internal quotations omitted). Accordingly, it evaluated the substance of BCP and Add-On to determine the business purpose's validity. It evaluated how the option pairs functioned and found the option pairs would never hit the sweet spot. The Tax Court found Add-On was focused on tax savings: it was promoted specifically to offset capital gains from CDS and transaction fees were based on the tax loss generated. Without the sweet spot, the maximum payout from participating in the Add-On was less than the transaction costs to acquire the options and participate.[17] We agree with the Tax Court's ultimate conclusion that BCP had no valid business purpose.

Tax minimization as a primary consideration is not unlawful. *ASA Investerings*, 201 F.3d at 513. Nevertheless, the business purpose doctrine can be violated if the structuring for tax benefits has "gotten out of hand" and the business purpose is "no more than a facade." *Id.*; *see also id.* at 514 ("a transaction will be disregarded if it did 'not *appreciably* affect [taxpayer's] beneficial interest except to reduce his tax.'" (brackets in original) (quoting *Knetsch v. United States*, 364

---

[17] The Taxpayers' argument that the Tax Court erred by considering the lack of profit motive misses the point—a transaction is valid under the business purpose doctrine if it is "undertaken for profit *or* for other legitimate nontax business purposes." *Horn*, 968 F.2d at 1238. The Tax Court concluded that neither existed and, accordingly, found BCP to be a sham. We cannot fault the Tax Court for covering its bases.

U.S. 361, 366 (1960)). In other words, the business purpose doctrine is "simply [a] more precise factor[] to consider in the application of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses." *Horn*, 968 F.2d at 1237 (internal quotations omitted). We do not disagree with the Tax Court's conclusion that BCP and the Add-On had no practical economic effect other than the creation of tax losses. Client members invested only $16.5 million in the option pairs and claimed $3.1 *billion* in tax losses. Those losses were artificial—which the Tax Court recognized. *BCP*, 2017 WL 3394123, at \*16. And any diversification benefit was only in the options' payoff distribution. But no option pair in fact paid out—they all either expired worthless or were sold before their exercise date. No "diversification benefit" in the payoff was had—plainly by design.[18]

### III. SIMPSON'S INTERVENTION

Simpson's motion for intervention came about through a gap in Tax Court rules. After the Tax Court released its 2017 memorandum opinion, it ordered the parties to agree on the language of its final decisions. When the parties subsequently conferred, a non-participating party (Simpson) was discovered. If a tax case settles, Tax Court Rule 248 requires the Commissioner to move for entry of decision and the court to wait 60 days to see if a non-participating party objects to the settlement before issuing its decision. *See* Tax Ct. R. 248(b)(4).

---

[18] To the extent the Tax Court's statements regarding the effect of disregarding BCP could be read to determine the Taxpayers' outside bases in BCP, the Tax Court lacked jurisdiction to do so— which it acknowledged. *BCP*, 2017 WL 3394123, at \*12; *see Petaluma FX Partners, LLC v. Comm'r*, 792 F.3d 72, 77 (D.C. Cir. 2015). In addition, those findings were not included in the Tax Court's final decisions.

There is no analogous rule, however, if the parties litigate and subsequently agree on the language of the decision. Here, Simpson's late husband was a partner in Moore Trading Partners (MTP) and MTP was a partner in BCP; his estate "was an indirect partner and thus a party, [who] had not participated in the litigation." J.A. 2448. In any event, on October 26, 2017, the Tax Court gave 60 days' notice of the proposed decisions to non-participating parties. On August 6, 2018, Simpson, individually and as the surviving spouse of Singleton "Garry" Simpson, moved to intervene to assert an untimeliness defense. Simpson "adopt[ed] and incorporate[d]" the Taxpayers' legal arguments regarding their statute of limitations defenses and attached documents to establish that she and her husband had not agreed to an individual extension until after the limitations period had expired. J.A. 2454. On February 6, 2019, the Tax Court denied Simpson's motion to intervene.

The Tax Court has not issued rules for third-party intervention. *McHenry v. Comm'r*, 677 F.3d 214, 216 (4th Cir. 2012). Under Tax Court Rule 1(b), the Tax Court is authorized to prescribe such procedure, "giving particular weight to the Federal Rules of Civil Procedure to the extent that they are suitably adaptable to govern the matter at hand." Tax Ct. R. 1(b). We agree with the Fourth Circuit that, because Tax Court Rule 1(b) gives the Tax Court "broad discretion in deciding whether and to what extent to follow Federal Rule of Civil Procedure [(FRCP)] 24 governing intervention" and because "Rule 24 itself confers broad discretion on a trial court, we give great deference to a Tax Court's decision to deny intervention, reviewing only for a *clear* abuse of discretion." *McHenry*, 667 F.3d at 216. Here, the Tax Court did not clearly abuse its discretion in denying Simpson's motion to intervene.

Simpson did not specify whether she was seeking mandatory intervention under FRCP 24(a) or permissive

intervention under FRCP 24(b) and so the Tax Court addressed both. First, the Tax Court noted intervention of right is not appropriate if the existing parties adequately represent the intervenor's interests, *see* Fed. R. Civ. P. 24(a), and permissive intervention is not appropriate if it would unduly delay the adjudication of the existing parties' rights, *see* Fed. R. Civ. P. 24(b). It observed that, if *either* her individual extensions *or* the Partnership Extension was valid, any adjustments were timely. The Tax Court had earlier found the Partnership Extension valid and Simpson offered no additional argument on the Partnership Extension—incorporating by reference the Taxpayers' failed argument. Accordingly, the Tax Court determined Simpson was adequately represented on the issue because she asserted no other basis for the Partnership Extension's invalidity—failing intervention of right. It also concluded that Simpson failed permissive intervention because such intervention would "merely duplicate" the Taxpayers' Partnership Extension argument "which would serve only to further delay [the litigation's] conclusion." J.A. 2487. We therefore conclude that the Tax Court did not abuse its discretion in denying Simpson's motion to intervene.

For the foregoing reasons, the Tax Court's memorandum opinion issued August 7, 2017, its order issued February 6, 2019 and its two decisions issued February 7, 2019 are affirmed.

*So ordered.*